(C. D. 1978)

BROWN BOVERI CORP.
GEHRIG HOBAN & CO., INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 10, 1958)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation described in the record as voltage regulators was classified by the collector of customs as switchgear in paragraph 353 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was imposed thereon at the rate of 17½ per centum ad valorem.

Plaintiffs claim that the devices are not switchgear and should be classified in said paragraph 353, as modified, *supra*, as "other" articles suitable for controlling electrical energy and dutiable at the rate of 15 per centum ad valorem. It is alternatively claimed by plaintiffs that voltage regulators are articles having as an essential feature an electrical element or device and, as such, should be classified in said paragraph 353, as modified by the President's proclamation relating to the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, and dutiable at the rate of 13¾ per centum ad valorem.

## THE STATUTES

The pertinent text of paragraph 353, *supra*, is here set forth:

Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802:

[353] Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

    Switches and switchgear which are not wiring apparatus, instruments, or devices; fans; blowers; and washing machines_____ 17½% ad val.

    *      \*      \*      \*      \*      \*      \**

    Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines)_____ 15% ad val.

Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739:

[353] Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

    *      \*      \*      \*      \*      \*      \**

    Other * * *_____ 13¾% ad val.

The only witness in the case, Werner R. Streuli, was called by the plaintiffs. The substance of his testimony follows: He is vice president of Brown Boveri Corp., the importer, is an electrical engineer, and supervises the operation of the electrical division of the corporation. He described a voltage regulator as being about 10 inches high, 8 inches wide, and about 8 inches deep, weighing approximately 20 pounds. The device is depicted in illustrative exhibit 1 opposite page 6, and its various parts are described on page 6. Streuli testified that he had seen voltage regulators like those in controversy manufactured in Switzerland; that, in their condition as imported, they are in an unfinished state and require a certain amount of engineering to make them ready for operation. They are then shipped to various customers. "Anybody who generates electric power is a potential customer of ours that might be utilities, power plants of the type that have their own power supply, Coast Guard, Navy, airports, and others." When in use, they are placed near the generators to which they are connected with wires.

When asked to explain the function of the voltage regulators, the witness replied:

These voltage regulators which we call generators—generator voltage regulators are an accessory to an electric generator. When an electric generator is connected to the customer's and the customer's load varies, the voltage which the generator supplies goes up and down, depending on the load and as a consequence, if the customers have lights connected to the line, the lights would either grow dim or bright, which is not desirable. The voltage regulator receives the voltage from the generator terminals and if the voltage is not right, it transmits an order to the generator so that it brings the voltage back to where it should be.

The voltage capacity of the imported regulators is 115 volts, and they are customarily used with generators up to about 400 KVA (kilo volt amperes). The voltage regulators contain an electric motor whose source of power is from the generators. As stated by the witness, "* * * it is a very small power but that is the way it is. If the voltage regulator is at the figure it should be, the motor is at a standstill. If the voltage of the generator is too high or too low, the motor turns one way or the other and by turning one way or another, it changes the field of the generator which then causes the voltage to come back to its correct figure."

The witness displayed a familiarity with what is known as a switch or switchgear, which he stated has been a part of his life's work, and that the company sells great quantities of this type of equipment in this country. He described the switch as a device to open an electric circuit. "Now, switch gear, I would say is the aggregate of devices which are customarily inserted between a generator and the users." When asked if the terms "switch" and "switchgear" are used with different connotations, the witness replied:

Switch is a more limited term, the way we engineers would use it. Switch gear is a general term, I should say, anything that goes between the generator and the final customer is switch gear with the exception of the lines and the transformers which are also in between. Switches, I would say are part of switch gear; a particular part of switch gear.

A switch is a device by which the flow of electricity can be interrupted. It is not ordinarily an automatic device. A circuit breaker is something that has the same function, but operates automatically. To illustrate the uses of a switch or switchgear, the witness stated:

If we take power over the terminals of a generator by means of wires that usually terminates at a circuit breaker, from that circuit breaker, we go to a busbar which is kind of a collector so-to-say for the power that comes off the generator and then from this busbar, we have a number of lines which go out to the various customers and that process is repeated again and again. Now, an aggregate installation compressing [sic] a breaker and buses and more breakers at the beginning of lines, I would call that switch gear.

It is always customary in electrical engineering to associate a switch with a circuit breaker because circuit breakers are automatic devices which need maintenance. Consequently, they must be separated from the power line, and, in order to do that, a switch is used.

Based upon his knowledge of the uses of switchgear and voltage regulators, the witness was of the opinion that voltage regulators are not switchgear; that the two articles perform two different functions.

The witness was asked:

What does a voltage regulator do that a switch gear does not perform?

THE WITNESS: Switch gear takes the power from a generator and distributes it with the necessary safety devices, like a breaker. The voltage regulator has nothing to do with that function. A generator could actually function without the voltage regulator.

The voltage regulator maintains a constant voltage coming from the generator.

In the condition as imported, the voltage regulators have a motor permanently installed. The essential parts which are added after importation are "usually coils wound from wire," which are called the resistance elements. Streuli testified that a switch is not used to break an electric current. "It just keeps the circuit open after a circuit breaker has broken the power." The voltage regulator does not break the circuit. It has nothing to do "with the power which comes from the generators. A switch does. A switch is somewhere in the circuit of the power which flows from the generators out to the users." While generators could function without the use of the voltage regulator, they could not operate successfully without switches or switchgears.

The testimony of the sole witness, Streuli, establishes that a switch is a device designed to keep an electric circuit open after it has been

broken by a circuit breaker. On the other hand, voltage regulators do not open an electric circuit. Since the voltage produced by a generator varies, the purpose of the voltage regulator is to control the voltage output and maintain a constant level by regulating the generator.

In *Federal Electric Products Co.* v. *United States*, 35 Cust. Ct. 47, C. D. 1720, we had under consideration a large piece of equipment described as a circuit breaker, which was designed primarily for use in the control of high-voltage motors. It had been classified for duty as laboratory apparatus. Upon the evidence before us in that case, we held that the device was not laboratory apparatus in the tariff sense, but was essentially a switch or switchgear, which regulates electrical energy by closing contacts and permitting electrical energy to flow into a motor or circuit. We held, further, that the importation consisted of "articles suitable for * * * controlling * * * electrical energy," namely, "switches and switchgear which are not wiring apparatus, instruments, or devices," within the meaning of said paragraph 353. In the course of our opinion in that case, we cited the following definitions:

Webster's New International Dictionary, 1950 edition:

> **switchgear,** *n.* * * * *Elec.* The mechanism used to operate large switches.
> **switch,** *n.* * * * 5. *Elec.* A device for making, breaking, or changing the connections in an electric circuit.

Funk & Wagnalls New Standard Dictionary of the English Language, 1942 edition:

> **switch,** *n.* **1.** * * * Electric switches are sometimes named (1) from their operation, or the purpose they serve; as, **changing switch** (changing a circuit from one source to another), * * *. **S.-gear,** *n.* The mechanism that works a switch, especially of a railway-switch.

The same authorities give the following definitions of the terms "voltage regulator" and "regulator":

> **voltage regulator.** *Elec.* A form of transformer having its primary winding in shunt and its secondary winding in series with an alternating-current circuit the voltage of which may be regulated by varying the voltage ratio of transformation. [Webster's New International Dictionary, 1950 edition.]
> **regulator,** * * * 5. *Elec.* * * * (3) A device for keeping at constant strength the current produced by a dynamo. [Funk & Wagnalls New Standard Dictionary of the English Language, 1942 edition.]

We find nothing in the above definitions inconsistent with the testimony of the witness, Streuli, and we are satisfied, upon the record before us, that the imported device is not a switch or a switchgear, but is an article designed primarily to control electrical energy, as claimed by the importer.

Inasmuch as the record discloses that the imported article has an electric motor permanently installed, it is also within the language

of the alternative claim in the protest as an article having as an essential feature an electrical element. However, the provision for articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy is clearly more definite and specific, and we so find. Based upon the testimony of the witness, Streuli, and for the foregoing reasons, we hold the merchandise classifiable in said paragraph 353, *supra*, and dutiable at the rate of 15 per centum ad valorem. That claim in the protest is sustained, and judgment will issue accordingly.